FRANCES LUSSE, Appellant, v. PETER LUSSE et
al., Respondents.

St. Louis Court of Appeals.  Submitted on Briefs April 15, 1909.
Opinion filed June 8, 1909.

1. DOWER: Fraudulent Conveyance by Husband: Evidence Re-
   viewed.  In an action by a widow to set aside a sale of personal
   property made by her deceased husband, as being in fraud of
   her marital rights, upon a review of the evidence, *held*, that
   the sale was a genuine transaction, for an adequate considera-
   tion and not in fraud of the wife's rights.

2. EVIDENCE: Sales: Conversations Between Vendor and Third
   Person.  In an action to set aside a sale as fraudulent, con-
   versations between the vendor and third persons, in the ab-
   sence of the vendee and after the consummation of the sale,
   do not bind the latter and hence should not be admitted in
   evidence.

Appeal from Lincoln Circuit Court.—*Hon. Jas. D. Bar-
nett*, Judge.

AFFIRMED.

*Chas. Martin* for appellant.

The disposition of all of his personal property by
Frank Lusse in anticipation of death and with the in-

tent to defeat his wife's statutory rights is void and gives an equitable right of action against the parties who took from him. Davis v. Davis, 5 Mo. 183; Stone v. Stone, 18 Mo. 389; Tucker v. Tucker, 29 Mo. 350; Tucker v. Tucker, 32 Mo. 6; Stroat v. O'Neil, 84 Mo. 68; Crecelius v. Horst, 89 Mo. 356; Newton v. Newton, 162 Mo. 173; Rice v. Waddill, 168 Mo. 99; Dyer v. Smith, 62 Mo. App. 606; Smith v. Smith, 55 Am. St. Rep. 142; Smith v. Smith, 65 Am. St. Rep. 251; Lines v. Lines, 24 Am. St. Rep. 487 and note. (2) That the transfer of all his property by Frank Lusse to his son was in anticipation of death and for the purpose of defeating his wife's rights in his estate there can be no question. He knew he had to have another operation performed and did not expect to have any further use for his property. He told Mr. Sitton that he did not intend to make any provision for his wife. (3) Peter Lusse to whom the property was transferred was a son and made his home with his father and must have known of his father's expectation of death and his purpose to defeat the plaintiff of dower in his personal estate. The unusual method of making the transfer—the efforts made and agreed upon between father and son to have the transfer made by bill of sale and the money paid in the presence of witnesses raises the presumption of fraud. Bishop's Fraudulent Conveyances (3 Ed.), 151; Reed v. Loyd, 52 Mo. App. 278; Snell v. Harrison, 10 Mo. 158; White v. Gibson, 113 Mo. App. 568; Brewing Co. v. Steimke, 68 Mo. App. 52.

*R. L. Sutton* and *Frank Howell*, for respondents, filed argument.

REYNOLDS, P. J.—Plaintiff instituted this suit as the widow of one Frank Lusse, Sr., who died intestate on the 31st of May, 1907, she claiming by her petition that before his death he was possessed of a large amount of personal property, consisting of horses, cattle, mules, corn, hay, farming implements and house-

hold goods, of the value of $1,000, and also of money, notes and accounts of the value of $1,000. Plaintiff charges that before his death her husband, believing that he could live but a short time, and in anticipation of death and for the purpose of wrongfully defrauding plaintiff, then his wife, out of her dower and other rights in his personal estate, and without value or sufficient consideration, had transferred, assigned, turned over and delivered to the defendants all of his personal property, money, and notes and that the defendants, agreeing among themselves and with her husband, jointly entered into such fraudulent and wrongful purpose and intent of her husband, and that they had accepted, received and now hold and wrongfully claim to own all of said personal estate of her late husband, without having paid or rendered any valuable or sufficient consideration therefor; claiming that she, as the widow of Frank Lusse, Sr., is lawfully entitled to dower and other exemptions out of the personal estate of Frank Lusse, Sr., as provided by statute, of the value of $750, and that by reason of the wrongful act of her said husband and the defendants, she is deprived and debarred from obtaining the same by legal process, and that defendants, having received and accepted, now hold, all of said personal estate of her husband, or the proceeds thereof, under and by virtue of the wrongful and fraudulent transfer and assignment to them as aforesaid, and that they are in equity and good conscience responsible for and liable to the plaintiff for the value of her dower and other exemptions in the personal estate of her former husband, as provided by statute; wherefore she prays judgment and that the value of her dower and other exemptions under the statute in the personal estate, so owned by her late husband, be found in the sum of $750, and that the defendants may be adjudged and decreed to pay her the same.

The defendants are the two sons, the daughter and

the son-in-law of plaintiff's late husband, they being children by a former marriage.

The defendant, Peter Lusse, filed a general denial by way of answer. The other defendants filed a general denial, accompanied by a plea in abatement, claiming that their co-defendant Peter was an unnecessary party and an improper party and had been joined merely to sustain jurisdiction, he being a resident of Lincoln county, the other three defendants being residents of the city of St. Louis and there served. It is unnecessary to notice this plea in' abatement in the view which the lower court took and which we take of the case.

At the trial before the court, it appeared that Frank Lusse, the former husband of plaintiff, resided in Lincoln county, rented and lived on a farm within a quarter of a mile of a farm which his wife owned and on which she resided with her children by a former marriage. The old people had not lived together for a few years before the death of the husband, owing to disagreements and trouble between the husband and the children of his wife by the former marriage. Frank Lusse was afflicted with some disease for which he had been operated on in a hospital with apparent benefit, and returned to his home in Lincoln county, living on the rented farm with his son, Peter Lusse. His wife, however, visited him frequently, looking after his comfort and attending him when he was attacked a second time with his malady. Along in the latter part of 1906 Frank Lusse was advised that he would have to submit to another surgical operation, and for that purpose he was advised to go to a hospital in St. Louis. He had no real estate, but was possessed of some horses and mules, some feed and a small amount of furniture and household utensils, but no money. On the 24th of December, 1906, Peter Lusse wrote Mrs. Striebel, his sister, and her husband, two of the defendants, that their father, referring to Frank Lusse, "is still suffering

and appears no better;" that the doctor said it would be better for him to go to the hospital; that he was not taken good and proper care of and that his wife had not been on the place for some time, and he (Peter) could not do much for his father "in the way he is now;" that his father said he wanted to go to the hospital and that he wanted to sell his horses and "all things he has;" that he needed money to pay his bills "when he goes to the hospital." Peter Lusse thereupon suggested to his brother-in-law Striebel, that if he would do him a favor and let him have the money to buy this stuff from his father, he (Peter) would give him (Striebel) a mortgage on what he bought, and if Striebel would let him sell the stuff when he could, he would pay him back as he sold. He asked him "to do this favor, if he could," and if he could do so to let him know at once when he could come up. The letter further stated that if he concluded to extend the accommodation, he must bring about $850 with him, as he, Peter, did not know just what the property he proposed buying from his father would come to, and he asked Striebel to write what day he could come and he would meet him at Old Monroe, and he repeats that he hopes that if Striebel can, he will do him this favor. The brother-in-law Striebel wrote, or more correctly had his wife write to Peter, saying that he would come up to Old Monroe on the 2nd of January and bring the money with him, and see what could be done. Accordingly on the 2nd of January, 1907, Striebel, having drawn his money from a bank, reached Old Monroe, was met at the station by Peter, and they went out to the farm where the old gentleman was living, the three of them talked the matter over, and Peter, having arranged a day or so before for three of the neighbors to be there that day, a bill of sale was made out by one of these neighbors, three of them being present and hearing and witnessing the transaction, whereby, in consideration of $818, Frank Lusse sold his horses, mules, farming im-

plements, corn and hay, chickens and household and
kitchen furniture to Peter Lusse, and Peter made out
or arranged to make out a note in favor of his brother-
in-law, Stephen Striebel for $818, securing the note by
a chattel mortgage covering the articles which Peter
had bought from his father, Frank Lusse. Whereupon
Striebel counted out, in the presence of three witnesses,
$818 in cash, and paid it to Peter, who in turn paid
it to his father, the latter taking possession of it and
putting it away in a wardrobe in the room. The mort-
gage was duly executed by Peter when he and Striebel
went to the railroad station that day on Striebel's re-
turn to St. Louis, and appears to have been duly re-
corded in the recorder's office of the county. Peter there-
upon appears to have taken possession of the property,
except the household furniture, which was in the house
occupied by himself and his father, and, under the ar-
rangement that he had with his brother-in-law, sold off
most of it and paid the proceeds over to his brother-
in-law, so that at the date of the trial Peter
had paid back to his brother-in-law all but $200 of the
$818 borrowed. In the latter part of February, Frank
Lusse was taken to the Alexian Brothers' Hospital, in
St. Louis, to undergo the surgical operation considered
necessary and remained there until his death on the
21st of May of the same year.

Plaintiff in the case endeavored to prove, by testi-
mony introduced, that the transfer of this property to
his son, which was practically all the property that
Frank Lusse owned, was made in contemplation of his
death. We cannot say, on a careful reading of all the
testimony in the case, that this is established with suf-
ficient certainty to justify us in disturbing the finding
of the court in holding otherwise. The testimony on
the part of the defendants, covering this point, was to
the effect, and tended to show, that the old gentleman
was conscious of the fact that he would be unable to
carry on farming operations any longer, and he had

made up his mind to get rid of what little property he, had in the country, give up farming, and after going through the operation necessary at the hospital, if he survived the operation and recovered, as the testimony seems to indicate he hoped to do, that he would spend the rest of his days in St. Louis with his daughter and her husband, between whom there had always been, as the evidence showed, the most affectionate feeling, the son-in-law for many years having come to the assistance of the old gentleman with loans of money and payments of different bills that the old man had incurred, both for his own sickness and during the sickness of a former wife, and another son, Frank, Jr., also living in St. Louis. It seems to us to be pretty well established, by the weight of the evidence in the case, that the sale to the son was a genuine transaction, and that it was for an adequate consideration is beyond question. There is not the slightest evidence of any undue influence on the part of the son Peter, who lived with his father on the rented farm, and in the latter period of his occupancy of the farm, had managed affairs for him, taken care of his cattle and apparently was the man who did all the work and provided for his father. The fact of the sale from the father to the son was known, not only to the three witnesses, neighboring farmers, who were present at the time it took place, but the testimony seems to show it was a fact known in the community. The title of the son to the property was never questioned, he taking possession of it and disposing of some of it before his father was removed to St. Louis, and before his father's decease, practically disposing of the greater bulk of it, mostly for cash, some of it on notes, all of which he turned over to his brother-in-law in payment on the note secured by the chattel mortgage. So that, as before remarked, at the time of the institution of this suit, or at the time of the trial of it, he had paid up all of the money except $200 of the $818 originally

borrowed. It is also in evidence in the case that the plaintiff was present in the house and going back and forward in the room on the 2nd of January when this sale was made by the old man to the son. The evidence showed that she was very hard of hearing, but there was also evidence tending to show that the old lady had been told of what was going on and that her husband had given her a lot of furniture, which was in her own house and which he left there when he removed from it. The only testimony introduced tending to show any design on the part of the old man to dispose of this property in fraud of his wife, was the testimony of her son, who testified, over the objection of the defendants, that a conversation took place in their absence and after the sale, on a visit which he and his mother made to the old man while he was in the Alexian Brothers' Hospital in St. Louis, in which the old man had told his wife to go up and look after his things, his cattle and things he had at the farm; and another witness testified that the old man had on one occasion told him that if he got well and got out of the hospital and wanted to get the property back again, he might take it back. These declarations, however, were made after the transaction between the father and the son and in the absence of any of the defendants and in no way bound them. They should have been excluded.

It is in evidence too, that the old gentleman paid out a part of this $818, as well as $165 he received for sale of a mule, on his debts, that he paid $250 on a note his son-in-law held, and that he gave his daughter money to pay his hospital expenses and for his funeral expenses. No contention is made by the plaintiff over these latter payments. While these payments account for but about four or five hundred dollars out of about one thousand which Frank Lusse, Sr., had shortly before his death, the defendants all deny having had any

part of it and there is no evidence strong enough to charge them with it.

The learned trial judge, at the conclusion of the testimony, found in favor of the defendants. The witnesses in the case were before him, except one or two, whose depositions were read by the plaintiff, and as the case turns so much on the manner and conduct of the witnesses, who were produced before the trial judge, and upon the weight of the evidence, we do not feel warranted in disturbing his finding. The judgment of the circuit court is affirmed. All concur.